**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| DAWNEISHA SPRATLEY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:22-cv-02411-JMG |
| | : | |
| KIDSPEACE CORP., | : | |
| doing business as | : | |
| KIDSPEACE HOSPITAL, *et al.*, | : | |
| Defendant. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **April 19, 2023**

Plaintiff Dawneisha Spratley repeatedly requested her former employer KidsPeace Corp. d/b/a KidsPeace Hospital and KidsPeace Children's Hospital to provide her a workplace accommodation for her disabilities under the Americans with Disabilities Act (ADA) including partial remote work. After engaging in lengthy discussions over a period of months, KidsPeace offered Ms. Spratley with a modified and flexible work schedule and public transit reimbursements—but the proffered accommodation did not include remote work. Ms. Spratley resigned from her position and sued KidsPeace. Ms. Spratley currently maintains claims KidsPeace violated the ADA for failure to accommodate, disability discrimination resulting in constructive discharge, and retaliation for requesting reasonable accommodations; the Pennsylvania Human Rights Act (PHRA) for claims identical to the ADA; and the Family Medical and Leave Act (FMLA) for retaliation. Before the Court is KidsPeace's Motion for Summary Judgment concerning all of Ms. Spratley's remaining claims. For the following reasons, KidsPeace's Motion will be denied in part and granted in part.

I.      **FACTUAL BACKGROUND**

1.   Ms. Spratley's Employment with KidsPeace

Defendant KidsPeace Corp. d/b/a KidsPeace Hospital and KidsPeace Children's Hospital (collectively "KidsPeace") is a private charity who provides "a unique psychiatric hospital; a comprehensive range of residential treatment programs; accredited educational services; and a variety of foster care and community-based treatment programs to treat children and young adults with emotional, mental, developmental, and behavioral disorders caused by trauma, abuse, neglect or other causes."[1]

KidsPeace employed Plaintiff Dawneisha Spratley in March of 2017 as the "Director of Social Services."  ECF No. 40-1 ¶6.  As the Director of Social Services, Ms. Spratley maintained "responsib[ility] for overseeing and monitoring all clinical staff and functions for the Hospital." Def.'s App. 3, ECF No. 33-4 at 94.  Other functions of the position included, inter alia:

> 1. Provide ongoing supervision to direct reports . . . as required/needed . . . .
> 6. Attend all applicable meetings and participate on appropriate committees.
> 7. Ensure there is continual risk assessment and risk management for each client; monitor the overall clinical response to risk management at the facility level.
> 9. Maintain positive customer relationships with both internal and external customers . . . .
> 14. Design, implement, and monitor new and innovative approaches in the delivery of evidence-based clinical services to inpatient population.
> . . .
> 16. Responsible for the recruitment, supervision, development, and training of all clinicians and case managers. . . .

---

[1] Def.'s Statement of Undisputed Facts, ECF No. 33-6 ¶1; *see also* Pl.'s Resp. to Def.'s Asserted Facts, ECF No. 40-3 ¶1.  The Court relies on the Parties' agreed-upon statements of facts found, inter alia, in Defendant's Statement of Undisputed Facts (ECF No. 33-6), Plaintiff's Response to Defendant's Asserted Facts (ECF No. 40-3), and Plaintiff's Statement of Additional Facts (ECF No. 40-1), and—at times—omits the Parties' internal citations to the Appendices submitted in support of Defendant's Motion for Summary Judgment.

*Id.*  As the Director of Social Services, Ms. Spratley was part of the "Hospital's leadership team ('HLF')."[2]  So "Ms. Spratley had a number of direct/indirect reports."[3]  Ms. Spratley's direct/indirect reports provided direct treatments to patients.[4]  But "Ms. Spratley did not provide patient care and was not a clinical worker" herself.  *Id.* ¶9 (internal citations omitted).

At the time of hire, KidsPeace did not advertise the Director of Social Services position as a "work from home" or remote position nor did KidsPeace inform Ms. Spratley the position was a work from home position.  ECF No. 33-6 ¶4; ECF No. 40-3 ¶4 (admitted in material part).  Ms. Spratley performed "normal work hours" at KidsPeace Hospital in Orefield, Pennsylvania, which required a commute from Philadelphia lasting over an hour per trip.  ECF No. 33-2, Spratley Dep. Tr. 34: 21-25; 35: 1-14.  Ms. Spratley continued to work in person at KidsPeace Hospital during the COVID-19 pandemic.  ECF No. 33-4 at 254, Rulli Dep. Tr. 40:4-14.  Nevertheless, Ms. Spratley's position required "the ability to work evenings, weekends, holidays, flexible hours and overtime as required."  ECF No. 33-4 at 96.  And Ms. Spratley provided, since 2017, she would work from home "during evenings and during weekends."  ECF No. 33-2 at 37, Spratley Dep. Tr. 34: 3-20.  Ms. Spratley provided she could perform her job duties from home due to: (1) her use of a work-issued laptop; (2) a software program used by KidsPeace called "SharePoint," an

---

[2] ECF No. 40-1 ¶6.  "The HLT [a]lso included the Director of Nursing, Director of Hospital Operations, Executive Director, Chief Medical Officer, and Vice President of Medical Affairs." *Id.* n. 1.

[3] ECF No. 40-1 ¶7.  Ms. Spratley's direct/indirect reports "include[ed] Board Certified Behavioral Analysts . . . , Assistance Social Service managers . . . , and Expressive Therapists."  *Id.*

[4] *Id.* ¶7; *see also id.* ¶7 ns. 2-5.

electronic medical record (EMR) system; and (3) communication with her team using Zoom meetings, phone, email, or through platforms like SMR or Sharepoint.  ECF No. 40-1 ¶16.

Throughout Ms. Spratley's employment, Sheila Rulli acted as the Director of Human Resources (HR), Cathy Martucci as the Assistant Director of HR, and Jessica Smoyer as a leave specialist.  ECF No. 40-1 ¶14 (internal citations omitted).  Ms. Martucci and Ms. Smoyer reported to Ms. Rulli.  *Id.*   KidsPeace Executive Director Dr. Randall Hines primarily supervised Ms. Spratley during her employment at KidsPeace until December 27, 2021.[5]

Ms. Spratley provided Dr. Hines often approved a flexible work schedule for Ms. Spratley to include occasional, intermittent work-from-home periods.  ECF No. 33-3, Spratley Dep. Tr. 260:9-25, 261:1-22.  For example, Ms. Spratley testified she "was permitted to be able to work from home if [she] had a doctor's appointment that existed and it was going to be a long . . . doctor's appointment."  *Id.*, Spratley Dep. Tr. 261:1-9. And "[i]f [she] had a personal appointment and it would just not make sense to come in, the understanding that [she] had was that [she] could adjust [her] schedule to be able to . . . come in different times of the week, work different times of the day."[6]

Beyond occasional permission to work from home, KidsPeace also permitted Ms. Spratley to work from home due to varying medical conditions she experienced.   ECF No. 33-3 at 85, Spratley Dep. Tr., 262:8-14.  For example, Ms. Spratley identified the following modified in-

---

[5] ECF No. 33-3 at 85, Spratley Dep. Tr. 262:4-7.  Dr. Hines also oversaw the entire HLT. ECF No. 33-4 at 243, Rulli Dep. Tr., 28:16-24, 29:5-8.

[6] *Id.*, Spratley Dep. Tr. 261: 10-16.  Ms. Spratley also gave the following example that, in light of her commute, if she "had a 9:30 MRI[,] [she] didn't need to come in for the rest of the day" in favor of working from home.  *Id.*, Spratley Dep. Tr. 261:17-22.

person work schedules in relation to different medical needs and conditions: (1) working from home for three months upon being rear-ended in an automobile accident and experiencing related injuries, *id.* at 87, Spratley Dep. Tr., 264: 8-14; (2) working from home for a period of at least three months in relation to a workmen's compensation claim and process following an injury from a client while on the job, *id.* at 89-90, Spratley Dep. Tr., 266: 6-21, 267: 1-16; and (3) working in a hybrid capacity (two days working remotely and three days at the hospital) upon informing Dr. Hines and HR of conditions of her high-risk pregnancy, *id.* at 90-91, Spratley Dep. Tr., 267: 17-25, 268: 1-7.[7]  Some of Ms. Spratley's work from home periods occurred before the COVID-19 pandemic. *See e.g.*, ECF No. 33-3 at 87, Spratley Dep. Tr. 264: 3-7 (providing her work from home period related to her eye injury occurred pre-pandemic); *id.* at 89, Spratley Dep. Tr. 266: 6-14 (providing her workman's compensation injury and subsequent work from home period occurred pre-pandemic).  Up until her resignation from KidsPeace, Ms. Spratley's received performance evaluations providing she met or exceeded expectations during her employment.  Pl. Supp. App., ECF No. 40-2 at 20-57.

   2.  Ms. Spratley's Family and Medical Leave Act (FMLA) Leave

   Ms. Spratley notified Dr. Hines and KidsPeace's Human Resources Department of her pregnancy in either February or April of 2021.  ECF No. 33-6 ¶14 (internal citations omitted).  Ms. Spratley later requested workplace accommodations for her high-risk pregnancy.  ECF No.

---

[7] Ms. Spratley also identified the following modified in-person work schedules in relation to different medical conditions: (1) working from home for "one to two weeks tops" while experiencing eye problems relating to holes in her retina, *id.* at 86-87, Spratley Dep. Tr. 263: 17-25, 264: 1-2; and (2) working from home to recover from various contagious injuries such as pink eye or a stomach bug, *id.* at 86, Spratley Dep. Tr. 263: 7-14.

33-6 ¶16 (internal citations omitted).  Dr. Hines granted Ms. Spratley's request to work for home during part of her pregnancy.  ECF No. 33-6 ¶16.

"On August 11, 2021, Ms. Spratley emailed Dr. Hines notifying him that she was admitted to the hospital for a premature and induced labor and would be starting her leave of absence earlier than anticipated."[8]  KidsPeace then granted Ms. Spratley's request for FMLA leave beginning August 9, 2021 through October 29, 2021.  ECF No. 33-6 ¶21 (internal citations omitted); ECF No. 40-3 ¶21 (admitted).  Ms. Spratley admits she did not have any issues relating to her FMLA request, and she did not receive "any comments or expressed any displeasure" related to her FMLA request.  ECF No. 33-6 ¶¶22-23; *see also* ECF No. 40-3 ¶¶22-23 (admitted in material part).  But Ms. Spratley later felt she had been treated differently after taking FMLA.  ECF No. 33-2 at 62-63, Spratley Dep Tr. 59:21-25, 60:1-25.

### 3.  KidsPeace's Hiring of Mr. Robert Scheffler and Staffing Landscape

In October 2021, KidsPeace hired Robert Scheffler as the Executive Vice President of PA Inpatient and Residential Services.  ECF No. 33-6 ¶32 (internal citations omitted).  Mr. Scheffler oversaw the operations of the hospital.  *Id.* ¶33 (internal citations omitted).  Upon Mr. Scheffler's hiring, he assessed "the staffing landscape of the hospital in order to determine what positions, if any, could work from home."  ECF No. 33-6 ¶35 (internal citations omitted); ECF No. 40-3 ¶35 (admitted).  "Mr. Scheffler decided the entire Hospital Leadership Team, including the Director of Social Services, would not be permitted to work from home."  ECF No. 33-6 ¶36; ECF No. 40-3 ¶36 (admitted).

---

[8] ECF No. 33-6 ¶19 (internal citations omitted).  Ms. Spratley also notified KidsPeace's Leave Specialist of the need for an earlier leave of absence and "providing an updated doctor's note reflecting the same."  *Id.* ¶20.

Ms. Rulli later testified the hospital experienced great staffing changes throughout 2021, and particularly during the summer of 2021.  ECF No. 33-4 at 337-38, Rulli Dep.  123:19-24, 124:1-24, 125:1-22.  Ms. Rulli described the year of 2021 as "chaotic."  *Id.* at 340, Rulli Dep. 126: 2-4.  For example, "[t]here were a lot of people who were refusing to get the vaccine.  There were threats of mandates all over.  . . . People were leaving the nursing industry, leaving the clinical industry; folks didn't want to work in inpatient."  *Id.* at 338, 123:24, 124:1-8.  And, although the hospital had faced staffing challenges throughout Ms. Spratley's employment, the challenges faced in 2021 were unique.  *Id.*, 124: 9-24, 125:1-5; *id.* at 340, Rulli Dep. 126:2-4.  And KidsPeace also had "a lot of new staff members who need[ed] to have their leader in person."  *Id.* at 339, 125:14-22.

### 4.  Ms. Spratley's Non-FMLA Leave Request and Reasonable Accommodations

Recognizing her FMLA leave would be exhausted after October 29, 2021, Ms. Spratley requested KidsPeace's approval for a personal leave of absence (or "non-FMLA" leave) to care for her daughter around September 10, 2021.[9]  KidsPeace granted Ms. Spratley's non-FMLA leave of absence from October 30, 2021 through January 3, 2022.  ECF No. 33-6 ¶¶29-30; ECF No. 40-3 ¶¶29-30 (admitted).

In October, Ms. Spratley met with her physicians in anticipation of returning to work.  ECF No. 40-1 ¶46 (internal citations omitted).  On October 27, 2021, Ms. Spratley sent an email to Dr. Hines requesting an earlier return to work date and other related work accommodations.  *See* ECF No. 33-3 at 208-09.  Ms. Spratley stated her doctors supported her returning to work on November

---

[9] ECF No. 40-1 ¶45 (internal citations omitted).   Ms. Spratley submitted a letter from a social worker requesting her leave be extended to care for her daughter.  ECF No. 33-2 at 77-78, Spratley Dep. Tr. 74:19-25, 75:1-14.

15, 2021 "with two requests": (1) she "be able to work from home to tend to the needs of her [daughter's] care" and (2) be provided "a flexible work schedule to allow for attendance to her [daughter's] and [her] own medical appointments over the next 6-12 months." *Id.* at 209.  Ms. Spratley attached doctors' notes to support her request. ECF No. 33-2 at 81, Spratley Dep. Tr. 78:7-8.  And Ms. Spratley stated, "All documentation has been submitted to Human Resources." ECF No. 33-3 at 209.  Dr. Hines responded to the email he "would approve this as requested" but "need[ed] to have the official request from HR before we finalize." *Id.* at 208.

Ms. Spratley also sent her November work from home request to KidsPeace's Human Resources via email to Jessica Smoyer.  ECF No. 33-3 at 184.  In her email to Ms. Smoyer, Ms. Spratley requested to "work from home for the time being due to [her] own medical needs as well as [her] daughters." *Id.* at 186.  The supporting doctor's note from the Children's Hospital of Philadelphia provided diagnoses for Ms. Spratley's daughter, as well as a request Ms. Spratley "be home with her [daughter] to care for her, monitor her, and take her to her many specialist appointments." *Id.* at 187.  And a doctor's note from Jefferson Health described a "medical opinion that Dawneshia Spratley may return to work on November 15th.  Patient currently requires flexible schedule to accommodate follow up medical appointments." *Id.* at 189.

On November 3, 2021, Ms. Spratley forwarded Ms. Smoyer Dr. Hines' email response providing he would approve her request but needed an official request from HR.  *Id.* at 191-92.  Ms. Spratley further provided she had already scheduled some procedures and appointments for her and her daughter over the next thirty days, "so if the accommodation request is not approved, [she is] not sure what to do. Please advise." *Id.* at 191.

Later that day, Ms. Smoyer responded to Ms. Spratley's email.  *Id.*  Ms. Smoyer's email response provided, inter alia:

. . . it has been decided that due to business necessity your accommodation request cannot be granted.  Upon reviewing your return to work note from your medical doctor, it is expected that you physically return to work on Monday, November 15, 2021.

If you are unable to report on November 15, 2021, we will accept your resignation.  I recognize this may be a difficult message to receive.  If you need to speak with anyone in benefits, please provide a date and time in which we may schedule a meeting.

Lastly, if you do decide to resign, you are welcome to reapply for an open position.

*Id.*  In response, Ms. Spratley requested a meeting.  ECF No. 33-6 ¶51 (citing ECF No. 33-2 at 98, Spratley Dep. 95: 13-25).

Ms. Spratley met with HR employees, Ms. Rulli, Ms. Martucci, and Ms. Smoyer, via Zoom later that day.  ECF No. 40-1 at 13 (citing ECF No. 33-2 at 100, Spratley Dep. Tr. 97: 12-17).  Ms. Rulli provided the call generally concerned Ms. Spratley's "concerns regarding her medical needs and her daughter's medical needs."  ECF No. 33-4 at 290, Rulli Dep. Tr. 76:3-13.   In her deposition, Ms. Spratley testified HR also communicated to her during this Zoom meeting "that there is a new executive vice president who is not approving accommodations of any kind and that they are requiring people to come in person."  ECF No. 33-2 at 101, Spratley Dep. Tr. 2-6.  So, Ms. Spratley provides, HR:

Suggested [she] come up with a tentative schedule . . . that would allow for [her] to be in person . . . .

And then so [she] left the meeting with the understanding that there [was] no option for [her] to work remotely at all and that [she] needed to think of a schedule option that could allow for [her] to attend the appointments and the therapies that [she] needed to go to as well as [her] daughter.

And so given that recommendation, [she] did that, and [she] responded with those suggestions.

*Id.*, Spratley Dep. Tr. 98: 7-23.   Ms. Spratley provided the conversation ended with her commitment that she wanted and needed her job, and thus would provide the suggested modified

work schedules—without any remote work—as requested. *Id.* at 104, Spratley Dep. Tr. 101: 11-16.  Ms. Spratley proceeded to email three modified work schedules not including remote work.[10]

Internally, Ms. Rulli provided Ms. Spratley's proffered modified work schedules to Dr. Hines and Mr. Scheffler for review.  ECF No. 33-4 at 425-26.  Ms. Rulli asked Dr. Hines and Mr. Scheffler to "let [her] know what schedule works best for KidsPeace" and "HR will coordinate with [Ms. Spratley] directly."  *Id.* at 425.  Mr. Scheffler responded: "Just to be clear, we are not able to accommodate any 'work from home' days, as [Ms. Spratley's] option 1 seems to indicate, but are certainly open to being flexible with when she puts her 40 hours as long as the needs of the facility are met."  *Id.* at 425.  Mr. Scheffler then directed Dr. Hines to provide "which of the remaining 2 options work best for the Hospital."  *Id.* at 425.  Ms. Rulli emailed a response in agreement with Mr. Scheffler's assessment of the work schedules.  *Id.* at 424.  Ms. Rulli further provided "Once you determine what schedule option of the two below, we need to make sure this is in a document that is signed by [Ms. Spratley] so she knows this is an accommodation we are offering to her and can be removed as hospital needs dictate."  *Id.*  Dr. Hines then responded selecting Ms. Spratley's second proffered temporary work schedule.  *Id.* at 424.

---

[10]  ECF No. 33-4 at 403-04.  Ms. Spratley offered the following modified work schedules:

> Plan A: Work Monday through Friday 7am-3pm; 8am-4pm with the option to have one day a week to work from home to allow for care for my daughter with her Medical Team.
> Plan B: Work Monday through Saturday 7am-3pm; 8am-4pm; with one week day off to work with my daughter with her medical team.
> Plan C: Work Monday through Friday 7am-3pm; 8am-4pm; with the option to make up hours on the weekend . . . .

*Id.* at 404.

Early November 4, 2021, Ms. Spratley emailed Ms. Rulli, Ms. Smoyer, and Ms. Martucci, notifying them of her doctors' concerns she would return to working in person on November 15, 2021. *Id.* at 402-03. Ms. Spratley provided her and her daughter's doctors provided a November 15, 2021 return-to-work date with the understanding Ms. Spratley would be returning to working from home, like she had before her maternity leave. *Id.* at 403. Ms. Rulli responded "[a]s mentioned yesterday, the staffing landscape has quite literally changed across the country and the behavioral health industry has been hit hard." *Id.* at 401-02. Acknowledging KidsPeace's previous work-from-home accommodations, Ms. Rulli further provided "KidsPeace is no longer in the position to allow the Director of Social Services of the KidsPeace Children Hospital to WFH."[11] And lastly, Ms. Rulli asked Ms. Spratley to "[p]lease advise if the [modified scheduling] options you provided yesterday remain viable." *Id.* at 402. Ms. Spratley responded "[t]he proposed schedules have not changed." *Id.* at 401.

Ms. Spratley then sent one additional email asking, due to questions from her doctors, whether her return to work date of November 15, 2021 could be delayed following two previously scheduled procedures. *Id.* at 400. Ms. Rulli responded KidsPeace was "unable to change [her] return to work date of November 15, 2021." *Id.* at 399. So Ms. Spratley should "follow up with [her] doctors and plan accordingly." *Id.* at 399.

On November 4, 2021, Ms. Rulli emailed Ms. Spratley to "confirm [KidsPeace's] ability to accommodate [her] request to temporarily adjust [her] work schedule." ECF No. 33-3 at 214. In an attached document, Ms. Rulli further provided "[e]ffective Monday, November 15, 2021 [Ms. Spratley's] new adjusted work schedule will be the following: Monday-Saturday (7am-3pm)

---

[11] *Id.* at 401. The Court understands "WFH" to mean "work from home."

or Monday – Saturday (8am – 4pm) with one week day off." *Id.* And Ms. Rulli clarified, "[s]ince [Ms. Spratley's] FMLA leave expired on 10/29/2021, this is not a protected accommodation." *Id.* Ms. Rulli also offered her phone and email contact information for follow up questions. *Id.*

On November 10, 2021, Ms. Spratley informed Ms. Smoyer, Ms. Rulli, and Ms. Martucci on the status of her acknowledgment and acceptance of KidsPeace's proposed modified schedule. ECF No. 33-4 at 397-98. She provided: "If it were just my daughter's health issues, I could make arrangements to return by 11/15/21. However, I cannot medically return by 11/15/21 in person." *Id.* at 397. She further described she "ha[s] had serious health complication with [her] carpal tunnel issues." *Id.* at 398. And "literally just need[s] a few extra weeks until 12/1/21 when [her] therapist and Primary Care Physician will release [her] to work without restrictions." *Id.* at 398. She also offered to work from home as of November 15, 2021 until she would be fully cleared within a few weeks. *Id.* To support her delayed start request, "Ms. Spratley submitted two different notes from her physicians, one being her primary care doctor putting her out through December 1, 2021, and one from her physical therapist, asking that she . . . remain home until December 1, 2021." ECF No. 40-1 ¶71 (citing ECF No. 33-3 at 215-16).

On November 12, 2021, KidsPeace granted Ms. Spratley's "request to extend her leave by two (2) weeks, and noted that the doctors treating her carpal tunnel anticipated she would return to work on Dec. 1, 2021 with 'no restrictions.'" *Id.* ¶72 (citing ECF No. 33-3 at 217). KidsPeace further provided Ms. Spratley's request for remote work could not be accommodated "due to business necessity." ECF No. 33-3 at 217. Nevertheless, KidsPeace also reaffirmed, upon Ms. Spratley's return to work, it would "accommodate a flexible schedule as outline in the letter dated [November 4, 2021] from Sheila Rulli." *Id.*

Ms. Spratley returned to work on December 1, 2021.  ECF No. 33-6 ¶67; ECF No. 40-3 ¶67 (admitted).  Ms. Spratley chose not to utilize the accommodation of a flexible schedule KidsPeace offered her.  ECF No. 33-6 ¶68; ECF No. 40-3 ¶68 (admitted).  Upon returning to work, Ms. Spratley dealt with various symptoms of her medical conditions, such as acclimating to new medications, ECF No. 40-1 ¶74; feeling dizzy and faint, *id.* ¶¶74-75; and finding it difficult to perform manual tasks with her hands, *id.* ¶75.  Ms. Spratly consulted her doctors.  *Id.* ¶76.

On December 6, 2021, Ms. Spratley emailed Ms. Rulli, Ms. Martucci, Ms. Smoyer, and Dr. Hines an additional request for accommodation with accompanying doctors notes.  ECF No. 33-3 at 218-21.  Ms. Spratley requested a partial work from home schedule.  *Id.* at 221.  Ms. Spratley also emphasized her "exceptional[] [work] perform[ance]"  *Id.* at 219.  Her correspondence provided she "would hate to be forced to resign because [she] had a child and . . . ha[d] medical challenges as a result."  *Id.*  Ms. Spratley also mentioned the ability of herself and other associates to successfully work remotely.  *Id.*  She ended her letter: "Please do not force me to resign."  *Id.* at 220.  Ms. Rulli responded and provided Kidspeace was "reevaluating [her] accommodation request."  And Kidspeace "may ask for more information from your doctor or request  a follow up conversation."  *Id.* at 222.

On December 7, 2021, Ms. Rulli and Mr. Scheffler internally discussed Ms. Spratley's updated request for accommodation.  ECF No. 33-4 at 432-33.  Mr. Scheffler stated, "The conditions that prompted us to deny the request [to work from home] the first time have not changed, so [KidsPeace will be unable to accommodate this [request] as well."  *Id.* at 433.  Mr. Scheffler also provided groups of employees who had previously worked remotely were shifting to in-person work.  *Id.*  Furthermore, Mr. Scheffler highlighted the differing job duties between the remote employees as "the [Director of Social Services] does need to be present and available

to have direct patient contact to adequately complete the job." *Id.*  Ms. Rulli responded to Mr.

Scheffler stating, inter alia:

> I recognize leadership did allow her to WFH FT during her pregnancy, I think even
> prior to that (Dr. Hines will have to address that piece). This was then followed by
> a FML. She has exhausted all for her FML time. So presumably she needs to hear
> loud and clear from Program leadership, why her request to WFH is denied since
> she was able to WFH FT while pregnant. I recommend that Dr. Hines and HR
> schedule a joint meeting and explain to her (once more) why her new request cannot
> be approved and no further requests will be reviewed until she is eligible for FML
> again.

*Id.* at 432.  Ms. Rulli also agreed with Mr. Scheffler's assessment of an appropriate accommodation

for Ms. Spratley.  *Id.*

On December 13, 2021, Ms. Rulli emailed Ms. Spratley concerning her updated

accommodation request.  ECF No. 33-3 at 223.  Ms. Rulli acknowledged Ms. Spratley's request

to work from home three days per week and provided "all employees in similar positions are being

required to return to the workplace to perform the essential functions of their position."  *Id.*  But

"[n]otwithstanding the foregoing, KidsPeace requires additional information to review [the]

accommodation request."  *Id.*  So Kidspeace asked Ms. Spratley to "provide this correspondence

to [Ms. Spratley's] physician and have the physician provide specific information with regard to

[Ms. Spratley's] medical condition and how it impacts [her] ability to perform [her] job at the

workplace."  *Id.*  Ms. Spratley later asked whether Kidspeace would also consider remote work

two days a week.  *Id.* at 228.  Ms. Rulli replied "[a]ny medical accommodation request requires

information from [her] doctor for KidsPeace to complete its evaluation of that request."  *Id.* at 227.

Ms. Spratley then asked why additional doctor's notes were needed.  *Id.*  Ms. Rulli then replied to

Ms. Spratley:

14

. . . [W]e need your physician to provide specific information with regard to your medical condition and how it impacts your ability to perform your job at the workplace.

* * *

Please understand that no decision has been made by KidsPeace as we agreed to reevaluate your accommodation request.  In order to do so, the first step is for your physician to provide us with the requested information.  Once we receive the requested information from your physician, we will likely have a discussion about the information and your accommodation request.

So to answer your simple question, we cannot make a determination on any accommodation request (2 or 3 days WFH) without receiving the requested information from your physician.  We stand ready to evaluate your accommodation request once we receive that necessary information.

*Id.* at 225-226.

On December 16, 2021, Ms. Spratley forwarded a letter from a physician describing her carpal tunnel syndrome diagnosis, symptoms, and recommendations.  *Id.* at 232.  The physician's note "described that Ms. Spratley had a loss of grip strength resulting in items falling out of her hand, the twisting motion associated with using keys to unlock doors caused her wrist to swell[,] and that gripping the steering wheel while driving caused increased symptoms."  ECF No. 33-6 ¶88; *see also* ECF No. 33-3 at 232.  The physician requested KidsPeace "allow Ms. Spratley to work remotely from home 3 days a week for the next 3 months."  ECF No. 33-3 at 232.  The physician also recommended physical and occupational therapy, hand braces, avoidance of aggravating circumstances, and limited driving.  *Id.*  On December 17, 2021, Ms. Spratley forwarded another physician's note from her OB/GYN.  *Id.* at 234.  The physician provided "[her] medical opinion that Dawneisha Spratley should work remotely whenever possible due to a postpartum condition.  She should be able to work from home at least 3 days."  *Id.*  In response to Ms. Rulli's request for additional information from Ms. Spratley's OB/GYN concerning her

postpartum condition, Ms. Spratley provided additional information from her OB/GYN physician.[12]  More specifically, Ms. Spratley's OB/GYN physician provided "[Ms.] Spratley requires frequent medical appointments for treatment of complications of pregnancy and the postpartum period." *Id.* at 238.

On December 22, 2021, Ms. Spratley, Ms. Rulli, Ms. Martucci, and Ms. Smoyer met via Zoom to discuss Ms. Spratley's partial work from home request.  ECF No. 33-6 at 17; ECF No. 33-2 at 162, Spratley Dep. Tr. 159: 7-16.  "During the meeting, alternative accommodations to address the specific needs as outlined in Ms. Spratley's medical documentations were discussed including paying for Ms. Spratley to utilize Greyhound, public transportation, and Uber to get her to and from work to limit her driving, assigning a person to open doors and hold items for Ms. Spratley and continuing Ms. Spratley's flexible schedule to enable her to attend appointments." ECF No. 33-6 ¶96 (internal citations omitted); ECF No. 40-2 ¶96 (admitted in material part).  Ms. Spratley then sent a follow-up email outlining the topics discussed in the December 22, 2022 meeting and asking for clarification.  ECF No. 33-3 at 242.  Ms. Spratley also inquired into the status of her OB/GYN's request for her to work remotely three days a week to attend frequent appointments for treatment.  *Id.*

On December 30, 2021, Ms. Rulli provided the following action items to Ms. Spratley as a result of their Zoom meeting: (1) Ms. Spratley to "go back to your doctor [to] your doctor find out the time and day of [her] 'frequent' appointments so KidsPeace is able to work on a schedule to reasonably accommodate [her] OB/GYN medical appointments[,]" and (2) to digest information

---

[12] *Id.* at 235.  Ms. Spratley also provided her OB/GYN physician's "concern[] that in all her years of practice, she never experienced an employer intentionally violating HIPPA when it came to their employees."  *Id.* at 235.

provided concerning the alternative transportation options provided.  ECF No. 33-3 at 241.  Ms. Rulli further provided Kidspeace "certainly want[s] [Ms. Spratley] back in the hospital 40 hours a week.  However, [KidsPeace] need[s] to address [her] accommodations as reasonably as [they] can." *Id.*

"On December 31, 2021, Ms. Rulli sent a follow up email to Ms. Spratley reiterating where they were at in the accommodation process and outlining all of the accommodations that were offered to Ms. Spratley as of that date."  ECF No. 33-6 ¶99; ECF No. 40-3 ¶99 (admitted); *see also* ECF No. 33-3 at 244.  The accommodations included: "providing payment/reimbursement for the costs of public transportation and Uber three days a week, stating KidsPeace would work with Ms. Spratley to determine the public transportation which was available and necessary for the accommodation; providing an associate to assist with tasks such as opening doors and holding items; and the ability to work a flexible schedule during the week."  ECF No. 33-6 ¶100; ECF No. 40-3 ¶100 (admitted); *see also* ECF No. 33-3 at 244.  Ms. Rulli also "outlined an example of a possible flexible schedule including the ability to work four (4) ten hour days or three (3) twelve hour days and one four (4) hour day to enable Ms. Spratley to schedule her necessary appointments on the days and times that she would not otherwise be working." ECF No. 33-6 ¶100; ECF No. 40-3 ¶100 (admitted); *see also* ECF No. 33-3 at 244.  And lastly, Ms. Rulli also provided these flexible schedules would limit Ms. Spratley's need to drive to the workplace.  ECF No. 33-6 ¶100; ECF No. 40-3 ¶100 (admitted); *see also* ECF No. 33-3 at 244.

Ms. Spratley responded to Ms. Rulli's email outlining KidsPeace's accommodations on January 1, 2022.  ECF No. 33-6 ¶101; ECF No. 40-2 ¶101 (admitted).  Ms. Spratley provided, inter alia:

> you are talking about opening doors or taking public transit, singling out some
> examples I gave as difficulties currently. But you are missing that I need to do
> therapy at home, have access to medications, rest in ways I cannot rest in the office,
> and that me continuing to work from home for several months will allow me to heal
> and resolve my ongoing health complications.

ECF No. 33-6 ¶101 (internal citations omitted); ECF No. 40-2 ¶101 (admitted).  Ms. Spratley then

provided an additional doctor's note concerning her postpartum depression.  ECF No. 33-3 at 256.

In the note, Ms. Spratley's OB/GYN provided:

> . . . I have recommended [Ms. Spratley] speak with her therapist weekly (1-3 times
> per week).  I have recommended a consultation with Psychiatry/Primary Care for
> ongoing medical management.  In order to help reduce stress and comply with the
> treatment plan, I recommend a modified work schedule (ie. shorter work days or
> hours) and ability to work remotely if possible.

*Id.* at 256.  Ms. Spratley also provided a doctor's note concerning her carpal tunnel diagnosis and

treatment.  *Id.* at 257-58.  The doctor's note on carpal tunnel provided, inter alia, shifts of ten to

twelve hours "could greatly exacerbate the carpal tunnel syndrome and prolong the disorder."  *Id.*

at 257.  And "[t]he patient should continue working 3 days a week from home."  *Id.*

    5.   Final Accommodation and Subsequent Resignation

Around 5:00 p.m. on January 5, 2022, Ms. Martucci responded to Ms. Spratley's updated

accommodation requests on behalf of KidsPeace.  *Id.* at 267.  Ms. Martucci first summarized the

recommendations provided by Ms. Spratley's doctors, including: "speak[ing] with your therapist

weekly (1-3 times per week); . . . obtain[ing] a consultation with Psychiatry/Primary Care for

ongoing medical management; and a modified work schedule (ie.[sic] shorter work days or hours)

and ability to work remotely if possible."  *Id.*   As well as the following recommendations

concerning Ms. Spratley's carpal tunnel syndrome: "a 10-12 hour work schedule may exacerbate

your carpal tunnel syndrome" and "work[ing] from home three days a week without providing any additional justification as to the necessity of the recommendation." *Id.*

Ms. Martucci then communicated KidsPeace's suggested accommodation "[b]ased upon the documentation provided." *Id.* The accommodation was to last "for the next 90 days, to allow [Ms. Spratley] to perform the essential functions of [her] position." *Id.* KidsPeace thus offered "a reduced work schedule of six (6) hours per day for five days a week." *Id.* And Kidspeace would "work with [Ms. Spratley] to have flexibility on scheduling the five days per week by allowing [her] to work various days or schedules to permit [she] . . . attend any appointments which may be necessary outside of the required work hours." *Id.* Furthermore, KidsPeace offered to "continue to provide payment/reimbursement for the public transportation-related costs so [she] can limit the time . . . driving in accordance with the recommendation of [her] treating physician." *Id.*

Ms. Martucci then acknowledged Ms. Spratley "prefer[red] to work from home for the three days per week, [but] KidsPeace is not required to merely grant [her] requested accommodation." *Id.* Ms. Martucci further provided reasoning for Ms. Spratley to be in person, including (1) "at this time employees are being required to return to the workplace[,]" (2) "[t]he employees you directly manage are returning to the workplace along with employees in similar positions to yours[,]" and (3) "[i]t is essential that you[r] job functions are performed at the workplace." *Id.* at 268. Ms. Martucci provided KidsPeace "addressed every limitation set forth in the documentation . . . provided from [her] treating physicians." *Id.* Ms. Martucci also provided her contact information "to discuss the flexible schedule . . . and to determine applicable transportation." *Id.*

At 8:24 p.m. on January 5, 2022, Ms. Spratley emailed notice of her resignation to Mr. Scheffler as well as Ms. Rulli and Ms. Martucci. *Id.* at 270-71. Ms. Spratley provided her

resignation would be effective as of January 5, 2022, and her last day of employment would be January 28, 2022.  *Id.* at 270.   Ms. Spratley further provided reasoning for her resignation, including denial of her requested accommodations "without any viable alternatives considered or offered."  *Id.* at 271.   She expressed she "wanted to stay employed, [but is] forced to end [her] employment under such circumstances to look for employment where another business may consider reasonable accommodations."  *Id.*   Nevertheless, Ms. Spratley also provided "[i]f KidsPeace Hospital is willing to be flexible and not require [her] to work 100% of the time from the physical workplace (i.e. letting [her] telecommute for several days per week in the coming months), please let [her] know and [she] will reconsider this notice of resignation."  *Id.*   Mr. Scheffler confirmed his receipt of Ms. Spratley's resignation.  *Id.*

      6.    <u>The Present Action</u>

Ms. Spratley sued KidsPeace Corp. and KidsPeace Children's Hospital Inc. on June 20, 2022.  *See* ECF No. 1.   Currently, Ms. Spratley pursues claims against her former employer KidsPeace for violations of the Americans with Disabilities Act (ADA) for failure to accommodate, disability discrimination resulting in constructive discharge, and retaliation for requesting reasonable accommodations; the Pennsylvania Human Rights Act (PHRA) for claims identical to the ADA; and the Family Medical and Leave Act (FMLA) for retaliation.  *See* ECF No. 40 at 3.   Before the Court is KidsPeace's Motion for Summary Judgment concerning all of Ms. Spratley's remaining claims.  *See* ECF No. 33-1 at 3.

## II.    LEGAL STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderso*n, 477 U.S. at 252).

21

III.     **DISCUSSION**

1.   <u>Plaintiff's ADA & PHRA Disability Discrimination Claims</u>

Plaintiff brings disability discrimination claims under the ADA and PHRA under theories of actual/perceived/record of disability discrimination and failure to accommodate.  The Court addresses whether summary judgment is warranted under either of theses theories.

    a.   Actual/Perceived/Record of Disability

First, to establish a prima facie case of disability discrimination under the ADA and the PHRA, a plaintiff must establish:  "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and  (3) [s]he has suffered an otherwise adverse employment decision as a result of the discrimination."  *Garcia v. Vertical Screen*, 592 F. Supp. 3d 409, 419 (E.D. Pa. 2022) (citing *Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir. 1998) (addressing the ADA); *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002) ("The PHRA is basically the same as the ADA in relevant aspects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts.") (internal quotations omitted)).

Summary judgment is warranted concerning Plaintiff's disability discrimination claim under the ADA and PHRA because she has not established she suffered an otherwise adverse employment decision as a result of discrimination.   Here, KidsPeace, through various employees, and Ms. Spratley engaged in conversation about Ms. Spratley's requested accommodation of, inter alia, two to three days of remote work per week over a period of months.  On January 5, 2022, Ms. Martucci advised Ms. Spratley of KidsPeace's most recent accommodation attempt.   The accommodation provided to Ms. Spratley included: a reduced work schedule of six-hour days for

five shifts a week, flexibility on scheduling to attend appointments, and payment and/or reimbursement for public transportation-related costs. ECF No. 33-3 at 267. In her notice of the accommodation, Ms. Martucci did not mention resignation; in fact, Ms. Martucci provided her contact information for Ms. Spratley for further discussion of the accommodation. *Id.* Later that night, Ms. Spratley—on her own accord—emailed notice of her resignation to Mr. Scheffler as well as Ms. Rulli and Ms. Martucci.[13] Thus, Ms. Spratley resigned from her position at KidsPeace following an offer of accommodation.

KidsPeace submits Ms. Spratley did not suffer an adverse employment action because she voluntarily resigned. ECF No. 33-1 at 15. Ms. Spratley contends she suffered an adverse action because her resignation from KidsPeace amounted to constructive discharge. ECF No. 40 at 30.

The U.S. Court of Appeals for the Third Circuit has found "[e]mployee resignations are presumed to be voluntary." *Peifer*, 2023 WL 125017, at *8 (citing *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999)). "This presumption remains intact until the employee presents evidence to establish that the resignation [...] was involuntarily procured." *Id.*

And further, the U.S. Court of Appeals "has embraced an objective test to determine whether an employee can maintain a claim for constructive discharge, and this test requires that courts 'determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" *O'Donnell v. Pennsylvania Dep't of Corr.*, 790 F. Supp. 2d 289, 306 (M.D. Pa. 2011), *aff'd*, 507 F. App'x 123 (3d Cir. 2012) (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir.2010)

---

[13] *Id.* at 270-71. The Court notes Ms. Spratley also provided she would reconsider her resignation upon KidsPeace's willingness to allow her to telecommute several days per week for the upcoming months. *Id.* at 271.

(internal quotation omitted)).  Relevant factors "to the issue of constructive discharge are whether the employer '(1) threatened [the employee] with discharge or urge[d] or suggest[ed] that she resign or retire (2) demote[d] her, (3) reduce[d] her pay or benefits, (4) involuntarily transferred [her] to a less desirable position, (5) altered her job responsibilities, or (6) gave 'unsatisfactory job evaluations.' " *Id.*  And "in most situations, a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign." *Stucke v. City of Philadelphia*, No. CIV.A. 12-6216, 2015 WL 2231849, at *5 (E.D. Pa. May 12, 2015), *aff'd*, 685 F. App'x 150 (3d Cir. 2017).

While constructive discharge is "normally a factual question left to the trier of fact," *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987), courts may resolve it as a matter of law where the plaintiff fails to present facts showing that the situation is "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." *Lane v. Wilkie*, No. 3:19-CV-1918-LAB-MSB, 2021 WL 3269661, at *5 (S.D. Cal. July 30, 2021).

Here, Ms. Spratley fails to show her resignation amounts to constructive discharge because the factors put forward by the Third Circuit do not overcome the presumption Ms. Spratley voluntarily resigned.  Ms. Spratley continued acting as Director of Social Services for KidsPeace while engaging KidsPeace in discussions of a suitable accommodation from September 2021 through Ms. Spratley's resignation on January 5, 2022. *See* ECF No. 40-1 ¶45 (internal citations omitted) (requesting personal leave of absence); ECF No. 33-3 at 270-71 (email resignation).  Throughout this period, there is no evidence of the following:  KidsPeace demoting Ms. Spratley, KidsPeace reducing Ms. Spratley's pay or benefits, KidsPeace involuntarily transferring Ms.

Spratley to a less desirable position; KidsPeace altering Ms. Spratley's job responsibilities, nor KidsPeace providing Ms. Spratley with unsatisfactory job evaluations.

The only possible claim Ms. Spratley makes relates to KidsPeace's suggestion that Ms. Spratley resign if she could not return to work on November 15, 2021.  ECF No. 33-3 at 191. KidsPeace's resignation suggestion arose within the following circumstances: Ms. Spratley's FMLA leave would be exhausted on October 29, 2021, ECF No. 40-1 ¶45 (internal citations omitted); upon a request from Ms. Spratley, KidsPeace provided her a non-FMLA leave of absence from October 30, 2021 through January 3, 2022, ECF No. 33-6 ¶¶29-30; Ms. Spratley requested an updated return-to-work date and other related work accommodations on October 27, 2021, *see* ECF No. 33-3 at 208-09; on November 3, 2021, Ms. Smoyer provided, inter alia, KidsPeace would allow a November 15, 2021 return to work date, and in the event Ms. Spratley could not report on November 15, 2021, KidsPeace would accept her resignation.  ECF No. 33-3 at 191.

Following the suggested resignation, Ms. Spratley met with multiple KidsPeace HR employees and engaged in further discussions concerning an accommodation.  *See e.g.*, ECF No. 40-1 at 13 (citing ECF No. 33-2 at 100, Spratley Dep. 97: 12-17), ECF No. 33-3 at 214.  Despite the suggested resignation, KidsPeace ultimately granted Ms. Spratley a return-to-work date beyond November 15, 2021.  ECF No. 40-1 ¶72 (internal citations omitted).  Ms. Spratley continued to work for KidsPeace for several months ahead of her resignation.  Ms. Spratley's actual resignation is thus temporally distant from Ms. Smoyer's resignation suggestion.  And Ms. Spratley's resignation is also otherwise attenuated from the resignation suggestion because Ms. Smoyer's resignation suggestion concerned Ms. Spratley's return-to-work date while Ms. Spratley's ultimate resignation stemmed from KidsPeace's offer of a modified work schedule without remote work. Therefore Ms. Spratley's only factor weighing in favor of constructive discharge is not persuasive.

*See Peifer*, 2023 WL 125017, at *9 (declining to find plaintiff was constructively discharged where only one factor weighed in favor of constructive discharge).

Furthermore, the Court is persuaded a finding of constructive discharge is not warranted here where Ms. Spratley quickly resigned without attempting KidsPeace's offered accommodation. The Third Circuit has noted that "in most situations, a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign." *Stucke*, 2015 WL 2231849, at *5.

Ms. Spratley's claim of constructive discharge thus "fails to present facts showing that the situation is "sufficiently extraordinary and egregious" for a finding of constructive discharge. *Lane v. Wilkie*, No. 3:19-CV-1918-LAB-MSB, 2021 WL 3269661, at *5 (S.D. Cal. July 30, 2021). Because Ms. Spratley can't establish the adverse employment action element of her prima facie claim, summary judgement is therefore warranted concerning Plaintiff's ADA and PHRA claims of actual/perceived/record disability discrimination.

> b. Failure to Accommodate

Ms. Spratley also brings claims of disability discrimination under a failure-to-accommodate theory. Under the ADA, an employer has a duty to provide reasonable accommodations to people with disabilities. *Lewis v. Univ. of Pennsylvania*, 779 F. App'x 920, 923 (3d Cir. 2019) (*See Colwell*, 602 F.3d at 504-05). A plaintiff alleging disability discrimination under a failure-to-accommodate theory needs to establish: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of the discrimination." *Garcia*, 592 F. Supp.

3d at 419 (internal citation omitted); *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002). But, in lieu of establishing an adverse employment decision, a plaintiff bringing a failure-to-accommodate discrimination claim can show their employer "fail[ed] to make reasonable accommodation for . . . [their] disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."); *see also Colwell*, 602 F.3d 495, 504 (3d Cir. 2010) ("Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities.") (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir.2004)). An employee can show an " . . . employer . . . breach[ed] this duty [to accommodate] by failing to provide an accommodation that is reasonable **or** by failing to engage in a good faith interactive process to identify accommodations." *Lewis*, 779 F. App'x at 923 (citing *Taylor*, 184 F.3d at 317–18).

Here, KidsPeace submits summary judgment is warranted because KidsPeace did not fail to provide Ms. Spratley reasonable accommodations and Ms. Spratley's refusal to accept alternate reasonable accommodations deems her not qualified. ECF No. 33-1 at 5. Ms. Spratley contends KidsPeace failed to provide an accommodation that is reasonable and failed to engage in a good faith interactive process.

"The ADA does not define the term 'reasonable accommodation' with much precision." *Ravel v. Hewlett-Packard Enter., Inc.,* 228 F. Supp. 3d 1086, 1093 (E.D. Cal. 2017) (citing 42 U.S.C. § 12111(9)). But "[t]he Equal Employment Opportunity Commission . . . has promulgated regulations that define 'reasonable accommodation' to include '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired

is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position.'" *Id.* (citing 29 C.F.R. § 1630.2(o)(1)(ii)). So a reasonable accommodation should enable an employee to perform the essential functions of their job.

Summary judgment is not warranted on Ms. Spratley's failure-to-accommodate claims because Ms. Spratley raises factual issues concerning the essential duties of her position and the reasonableness of KidsPeace's proffered accommodation. Viewing the facts in a light most favorable to Ms. Spratley, a jury could find KidsPeace's proffered accommodation as not reasonable. And such a finding would also prevent a jury from finding Ms. Spratley was not a qualified individual under the ADA because she rejected and/or refused to try KidsPeace's accommodation, as KidsPeace contends. See ECF No. 33-1 at 12-15.

Here, the Parties dispute (1) Ms. Spratley's full-time in-person presence at the hospital is an essential function of her position, and (2) KidsPeace's modified work schedule presented to Ms. Spratley was a reasonable accommodation. First, Ms. Spratley contends a full-time in-person schedule was not an essential function of her position. "A job duty is an 'essential function' when it is 'fundamental' to the position." *Bevan v. Cnty. of Lackawanna*, No. 3:17-CV-0919, 2017 WL 6336595, at *4 (M.D. Pa. Dec. 12, 2017) (citing 29 C.F.R. § 1630.2(n)(1)). "Evidence of whether a function is essential may include: (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; . . . (vi) [t]he work experience of past incumbents in the job; and/or (vii)[t]he current work experience of incumbents in similar jobs." *Id.* (quoting *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(n)(3)). And " '[w]hether a particular function is essential is a factual determination that

must be made on a case by case basis based upon all relevant evidence,' which should typically be left for the jury to resolve." *Id.* (quoting *Turner*, 440 F.3d at 612) (quoting *Deane v. Pocono Medical Ctr.*, 142 F.3d 138, 148 (3d Cir.1998) (en banc)).

Here, KidsPeace submits Ms. Spratley's position requires full-time in-person work, as demonstrated in her job description. ECF No. 33-4 at 94. But Ms. Spratley has shown she has worked remotely several times throughout her tenure as Director of Social Services; KidsPeace provided these periods of remote work for various reasons and for various lengths of time. *See* ECF No. 33-3 at 83-84, Spratley Dep. Tr. 260:9-25, 261:1-22; *id.* at 85, Spratley Dep 262:8-14. Ms. Spratley maintained satisfactory job evaluations throughout her periods of remote work. ECF No. 40-2 at 20-57. And Ms. Spratley provided several tools she can utilize to perform her job functions when working from home. ECF No. 40-1 ¶16. Viewing all the facts in the light most favorable to Ms. Spratley, a reasonable jury may find full-time in-person work was not an essential function of her position.

And second, Ms. Spratley contends KidsPeace failed to provide her a reasonable accommodation. Here, Ms. Spratley began working as the Director of Social Services for KidsPeace in March of 2017. After giving birth to her daughter, Ms. Spratley took FMLA leave from KidsPeace from August 9, 2021 until October 29, 2021. ECF No. 33-6 ¶21 (internal citations omitted); ECF No. 40-3 ¶21 (admitted). At issue is Ms. Spratley's workplace accommodations request following her use of FMLA leave time.

Upon preparing to return to work following her pregnancy, Ms. Spratley requested a flexible work schedule including work from home days over a period of six to twelve months. ECF No. 33-3 at 209. Throughout discussions with KidsPeace concerning this accommodation request, Ms. Spratley provided doctors notes with recommendations of remote work and a flexible

or modified work schedule to accommodate the medical needs of Ms. Spratley and her daughter. *See e.g.*, ECF No. 33-3 at 186, 187, 189; ECF No. 40-1 ¶71 (citing ECF No. 33-3 at 215-16); ECF No. 33-3 at 218-21; ECF No. 33-3 at 232, 234, 238, 256.   Ultimately, on January 5, 2022, KidsPeace provided an accommodation to Ms. Spratley of a reduced work schedule of six-hour days for five shits a week, flexibility on scheduling to attend appointments, and payment and/or reimbursement for public transportation-related costs.  ECF No. 33-3 at 267.  Ms. Spratley disputes KidsPeace's proffered accommodation was reasonable in light of her medical condition and her doctors' recommendations.  Further, Ms. Spratley contends KidsPeace's accommodation involved "compound[ing] her commute significantly" by requiring "she take multiple forms of public transportation . . . and then an uber from any stop to the Hospital."  ECF No. 40 at 22.

"[T]he question of whether a proposed accommodation is reasonable is a question of fact." *Lewis*, 779 F. App'x at 923 (quoting *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 n.4 (3d Cir. 2006) (internal quotations omitted)).  Viewing the facts in a light most favorable to Ms. Spratley, a jury could reasonably conclude KidsPeace's proffered accommodation was not reasonable.  The Court is therefore unable to conclude as a matter of law whether KidsPeace's modified work schedule would or would not be a reasonable accommodation.  And this issue is further compounded by the Parties' disputes concerning the essential functions of Ms. Spratley's job and whether she could perform them from home.  *See Pinegar v. Shinseki*, 665 F. Supp. 2d 487, 502 (M.D. Pa. 2009) (denying summary judgment on a failure to seek reasonable accommodation claim because genuine issues of material fact exist regarding the essential functions of plaintiff's job).  So, even if KidsPeace acted in good faith, it is for the jury to decide whether its proposed accommodations not involving remote work would have been a reasonable

30

accommodation.[14]  Summary judgment is not warranted concerning Plaintiff's ADA and PHRA

claims on the basis of a failure to accommodate.

### 2.  Plaintiff's Retaliation Claims under the FMLA, the ADA, and the PHRA

Plaintiff also brings retaliation claims under the FMLA, the ADA, and the PHRA.

---

[14]     *See Lewis*, 779 F. App'x at 923.  Nevertheless, the Court finds convincing KidsPeace's contention it acted in good faith.  "An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Boandl v. Geithner*, 752 F. Supp. 2d 540, 559 (E.D. Pa. 2010) (quoting *Colwell*, 602 F.3d at 504 (internal citation omitted)).

A party can demonstrate "good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." *Lett v. Se. Pennsylvania Transportation Auth.*, No. CV 19-3170-KSM, 2021 WL 5544933, at *9 (E.D. Pa. Nov. 26, 2021) (quoting *Taylor*, 184 F.3d at 317).  The interactive process "is aimed at determining what reasonable accommodations, if any, can address the employee's disability," and it "requires a great deal of communication between the employee and the employer." *Lett*, 2021 WL 5544933, at *8 (internal citation omitted).  And "[b]oth parties bear responsibility for determining what accommodation is necessary," and "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* (citing *Taylor*, 184 F.3d at 312 (internal citations omitted))

 "By contrast, a party acts in bad faith when it 'obstructs or delays the interactive process,' otherwise fails to 'help the other party determine what specific accommodations are necessary,' or 'fails to communicate by way of initiation or response.'" *Id.* (citing *Taylor*, 184 F.3d at 312). Here, KidsPeace claims Ms. Spratley cannot show KidsPeace failed to make a good faith effort to assist her in identifying an accommodation for her disability.  KidsPeace engaged in a lengthy back-and-forth process with Ms. Spratley to understand her medical limitations and provide accommodations in accordance with KidsPeace's business needs.  Ms. Spratley points to KidsPeace's rigid decision against remote work, but a "refusal to reverse its denial [of an employee's requested accommodation] is not the same as a refusal to engage in the interactive process. *Williams v. Lincoln Fin. Grp.*, No. 1:17-CV-50, 2018 WL 3536419, at *7 (N.D. Ind. July 23, 2018).  Nonetheless, this factual issue and the factual issue concerning the reasonableness of KidsPeace's proffered accommodation shall be determined by a jury.

"The elements of retaliation under these . . . statutes are essentially the same: in order to state a prima facie case, a plaintiff must show that: (1) he engaged in a protected activity (such as taking FMLA qualifying leave, requesting a reasonable accommodation under the ADA, or making a complaint regarding an activity prohibited by Title VII), (2) he suffered an adverse employment decision, and (3) there was a causal connection between the protected activity and the adverse employment decision.

*Garcia*, 592 F. Supp. 3d at 422 (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004) (stating the elements of an FMLA retaliation claim); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (stating the elements of an ADA and Title VII retaliation claim)).

First, Plaintiff contends the "adverse employment action" element of a prima facie retaliation case differs from that of a discrimination case.  ECF No. 40 at 29.  The Court agrees. "The plaintiff's burden to establish a materially adverse employment action 'is less onerous in the retaliation context than in the anti-discrimination context.' "  *Root v. Decorative Paint, Inc.*, No. 3:21 CV 1552, 2023 WL 2734660, at *8 (N.D. Ohio Mar. 31, 2023) (quoting *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)).  "Here, a plaintiff must show "that a reasonable employee would have found the challenged actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' "[15]

---

[15] *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 509 (M.D. Pa. 2014), *aff'd*, 612 F. App'x 124 (3d Cir. 2015); *see also Sconfienza v. Verizon Pennsylvania Inc.*, 307 F. App'x 619, 624 (3d Cir. 2008) (finding adverse actions in retaliation cases "cover[s] those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.  In the present context, this means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.") (quoting *Burlington*, 548 U.S. at 57 (2006)).

Nevertheless, summary judgment is warranted on Ms. Spratley's retaliation claims because Ms. Spratley has not shown direct evidence of retaliation, nor has Plaintiff established the elements of a prima facie case under the FMLA, ADA, or the PHRA.

a.   FMLA Retaliation Claim

Ms. Spratley first contends KidsPeace used her taking of FMLA leave as a negative factor in its decision to deny her requested ADA accommodation.  Ms. Spratley submits Ms. Rulli's email during the accommodation request process is "direct evidence . . . KidsPeace used Ms. Spratley's taking of FMLA leave as a negative factor or basis to deny her current ADA related request." ECF No. 40 at 28.  But Ms. Rulli's email acknowledging Ms. Spratley used FMLA does not rise to the level of direct evidence of retaliation.

In December of 2021, Ms. Rulli engaged in conversation with Mr. Scheffler about Ms. Spratley's renewed requested accommodation of partial remote work due to flare ups of various medical conditions upon her return to work.  In an email, Ms. Rulli provided, inter alia,

> I recognize leadership did allow her to WFH FT during her pregnancy, I think even prior to that (Dr. Hines will have to address that piece). This was then followed by a FML. She has exhausted all for her FML time. So presumably she needs to hear loud and clear from Program leadership, why her request to WFH is denied since she was able to WFH FT while pregnant. I recommend that Dr. Hines and HR schedule a joint meeting and explain to her (once more) why her new request cannot be approved and no further requests will be reviewed until she is eligible for FML again.

ECF No. 33-4 at 432.  Ms. Spratley contends Ms. Rulli's statements concerning Ms. Spratley's FMLA usage are direct evidence she improperly relied on impermissible criteria concerning her consideration of accommodations.  The Court is not persuaded.

The U.S. Court of Appeals for the Third Circuit has found "[e]vidence constitutes direct evidence of retaliation if 'it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' " *Laurora v. Bayer Corp*, No. 21-2764, 2022 WL 4093738, at *4 (3d Cir. Sept. 7, 2022) (citing *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997) (internal quotation marks and citation omitted)). And " '[s]uch evidence leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision.' " *Id.* (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (internal quotation marks and citation omitted)). So "direct evidence: (1) 'must be strong enough to permit the factfinder to infer that a discriminatory [or retaliatory] attitude was more likely than not a motivating factor in the [defendant's] decision[;]' and (2) 'the evidence must be connected to the decision being challenged by the plaintiff.' " *Id.* (quoting *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010)). ". . .[A]mbiguous statements cannot be used to establish direct evidence of retaliation." *Id.* (citing *Anderson*, 621 F.3d at 269).

Ms. Rulli's email statements cannot be used as direct evidence of retaliation because they are ambiguous and do not reflect any illegitimate criteria was used in reaching a decision. First, the email message is ambiguous because there are other possible interpretations of the email. *See id.* (finding an email ambiguous where other possible interpretations existed). Here, the email could be interpreted as: (1) an acknowledgment Ms. Spratley used and exhausted her FMLA time, (2) emphasizing the need to explain Ms. Spratley's updated accommodation would differ from KidsPeace's previous accommodation offers, before and during her taking of FMLA leave, and (3) Ms. Rulli's understanding of the relation between accommodations under the ADA and eligibility requirements of FMLA leave. And further, Ms. Rulli's statements do not show the

**decisionmaker** used FMLA leave as a factor in the accommodation request.  Ms. Rulli relied on Mr. Scheffler's decisions concerning Ms. Spratley's accommodation request and Ms. Scheffler's previous email to Ms. Rulli provided he had already come to a decision on the requested accommodation.  *See* ECF No., 33-4 at 312-13, Rulli Dep. 98:22-24, 99:1-12; *see also* ECF No. 33-4 at 433.   Therefore the email's ambiguous content and attenuated connection to the accommodation decision shall not be considered direct evidence of retaliation.

Ms. Spratley will thus need to establish the three elements of FMLA retaliation claims to state a prima facie case, including (1) she engaged in a protected activity (here, taking FMLA qualifying leave), (2) she suffered an adverse employment decision, and (3) there was a causal connection.  *Garcia*, 592 F. Supp. 3d at 422 (citing *Conoshenti*, 364 F.3d at 146).  The Parties do not dispute Ms. Spratley engaged in protected activity by utilizing FMLA leave.  ECF No. 33-1 at 27.  But Ms. Spratley cannot show she suffered a materially adverse employment action.  And further, there was no causal connection between Ms. Spratley's engagement in protected activity and the contended adverse employment actions.

The FMLA provides it is unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C.A. § 2615.  Consistent with this prohibition, a materially adverse employment action requires "a reasonable employee would have found the challenged actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' "  *Burton*, 990 F. Supp. 2d at 509; *see also Sconfienza*, 307 F. App'x at 624.

Ms. Spratley seems to contend an adverse employment action can be shown either by KidsPeace's denial of Ms. Spratley's accommodation request under the ADA or Ms. Spratley's resignation.  ECF No. 40 at 30-32.  The Court is not convinced either of these actions "might have

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burton*, 990 F. Supp. 2d at 509. Retaliation claims under the FMLA are typically brought against employers retaliating against employees for opposing unlawful practices under the statute. 29 U.S.C.A. § 2615 (West). Here, following her use of FMLA leave, Ms. Spratley does not oppose any action made unlawful under the FMLA. Having exhausted her FMLA leave, Ms. Spratley— somewhat unrelatedly—requests accommodations under the ADA for various disabilities and medical conditions. *See Al Refat v. Franklin Fin. Servs. Corp.*, No. 1:19-CV-1507, 2021 WL 2588789, at *6 n. (M.D. Pa. June 24, 2021) (finding an employee likely fails to show participation in a protected activity "because 'merely requesting a religious accommodation is not the same as **opposing** the allegedly unlawful denial of a religious accommodation'") (emphasis added) (quoting *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018)). KidsPeace then engages Ms. Spratley in discussions concerning the requested accommodation, and, Ms. Spratley submits, fails to provide a reasonable accommodation, leading Ms. Spratley to resign.

The Court is unclear how KidsPeace's alleged failure to accommodate Ms. Spratley's requested accommodation under the ADA would dissuade a reasonable worker from making or supporting a charge of discrimination under the FMLA. This alleged employment action is much more attenuated than those federal courts have found to be materially adverse, such as where an employee complains about the particular kinds of discrimination protected by the statute. *See Lorenz v. Magee Women's Hosp. of U.P.M.C.*, No. CIV.A. 11-1126, 2012 WL 1229369, at *4 (W.D. Pa. Apr. 12, 2012) (finding a sufficiently adverse employment action under the ADEA and the ADA where the employer disciplined and threatened an employee following the employee's complaints to HR and requested disability accommodations). A reasonable employee would not be dissuaded from making or supporting a charge of discrimination under the FMLA because their

employer denied their ADA accommodation request, leading to their resignation.   Thus the underlying facts of Ms. Spratley's retaliation claim do not show a materially adverse employment decision.

Even assuming Ms. Spratley suffered a materially adverse employment decision, summary judgment is warranted because there is no causal connection between Ms. Spratley's use of FMLA qualifying leave and KidsPeace's denial of her requested accommodation or Ms. Spratley's ultimate resignation.   "In order to establish a causal connection between engagement in protected activity and an adverse employment action, a plaintiff must demonstrate either (1) a temporal proximity between the two events that is 'unusually suggestive' of retaliation, or (2) timing plus other evidence, such as evidence that the employer engaged in a 'pattern of antagonism' with the plaintiff."   *Boandl v. Geithner*, 752 F. Supp. 2d 540, 562 (E.D. Pa. 2010).

First, Ms. Spratley has not shown a temporal proximity between her use of FMLA leave and her resignation from KidsPeace and/or KidsPeace's ultimate denial of her request accommodation.   "In the FMLA retaliation context, where the 'temporal proximity' between the protected activity and adverse action is 'unusually suggestive,'" it may be sufficient to establish causation in a prima face case.   *DeCicco v. Mid-Atl. Healthcare, LLC*, 275 F. Supp. 3d 546, 560 (E.D. Pa. 2017) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012)).   "Courts measure temporal proximity from the first date on which the litigant engaged in his protected activity."   *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), aff'd, 847 F.3d 144 (3d Cir. 2017) (citing *Blakney v. City of Phila.*, 559 Fed.Appx. 183, 186 (3d Cir.2014)).   Here, the protected activity—FMLA leave beginning August 9, 2021—occurred 149 days (or four months and twenty-seven days) before KidsPeace's accommodation offer leading to Ms. Spratley's resignation on January 5, 2022.   Under the case law in this circuit, over four months

between the protected activity and alleged adverse employment action is not "unusually suggestive of retaliatory motive."  *See, e.g., Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir.2003) (finding temporal proximity not unduly suggestive when three weeks had elapsed between protected activity and adverse employment action); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.2004) (two months is not unusually suggestive); *see also Abdul–Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D.Pa.2014) (noting that "six days is at the long end of what has been held to be unusually suggestive.").

Ms. Spratley also cannot establish causal connection through timing plus other evidence. Here, Ms. Spratley has not shown KidsPeace engaged in a "pattern of antagonism" with Ms. Spratley during her requests for an accommodation.  No facts in the record establish KidsPeace engaged in a "pattern of antagonism" beyond its requirements under the ADA to seek a reasonable accommodation for Ms. Spratley.  KidsPeace's extensive communication and requests for doctors notes are not antagonizing beyond the employer's duty to engage in an interactive process " 'aimed at determining what reasonable accommodations, if any, can address the employee's disability,' and . . . "requir[ing] a great deal of communication between the employee and the employer." *Lett*, 2021 WL 5544933, at *8 (internal citation omitted).  And Ms. Spratley concedes KidsPeace did not offer any negative comments to her concerning her FMLA leave and took no displeasure in her taking FMLA leave or otherwise requesting accommodations.   ECF No. 33-2, Spratley Dep. 59: 8-20.  Although Ms. Spratley felt she had been treated differently as a result of taking FMLA because her subsequent accommodation requests did not end with Dr. Hines' approval, this accommodation approval process does not amount to antagonism.   ECF No. 33-2 at 62-63, Spratley Dep Tr. 59:21-25, 60:1-25.  No facts suggest any antagonism beyond KidsPeace's general awareness and consideration Ms. Spratley had utilized and exhausted her FMLA leave. *See e.g.*,

ECF No. 33-4 at 432 (Ms. Rulli email to Mr. Scheffler acknowledging FMLA leave).  The record thus does not show a causal connection between Ms. Spratley's use of FMLA leave and her resignation from KidsPeace and/or KidsPeace's offer of accommodation without remote work. Because Plaintiff cannot show a prima face case of retaliation under the FMLA, summary judgment is warranted.

                b.   ADA and PHRA Retaliation Claims

Ms. Spratley also brings retaliation claims under the ADA and PHRA.  As stated, "[t]he elements of retaliation under these . . . statutes are essentially the same: in order to state a prima facie case, a plaintiff must show that: (1) [s]he engaged in a protected activity . . . , (2) [s]he suffered an adverse employment decision, and (3) there was a causal connection between the protected activity and the adverse employment decision."  *Garcia*, 592 F. Supp. 3d at 422 (E.D. Pa. 2022) (citing *Conoshenti*, 364 F.3d at 146; Krouse, 126 F.3d at 500).  Here, KidsPeace contends Ms. Spratley makes a circular argument because she alleges she engaged in protected activity—requesting a reasonable accommodation under the ADA—and KidsPeace subsequently retaliated against her for the request by denying her requested accommodation.  ECF No. 33-1 at 29.  So, KidsPeace submits, "Ms. Spratley is simply recasting her failure to accommodate claim as  retaliation claims."  *Id.*  The Court finds persuasive KidsPeace's averment Ms. Spratley's retaliation claim is, in substance, a failure to accommodate claim.  So the Court has already addressed this claim in its proper context.  *See Williams v. Philadelphia Hous. Auth.*, 230 F. Supp. 2d 631, 639 (E.D. Pa. 2002), a*ff'd in part, rev'd in part on other grounds sub nom. Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004); *see also Garner v. Sch. Dist. of Philadelphi*a, 63 F. Supp. 3d 483, 500 (E.D. Pa. 2014), *aff'd sub nom. Gardner v. Sch. Dist. of*

*Philadelphia*, 636 F. App'x 79 (3d Cir. 2015) (finding plaintiff's retaliation claim "a repackaged statement" of his failure to reasonably accommodate claim).

And, furthermore, Ms. Spratley has not shown a causal connection between her request for accommodation and KidsPeace's denial of her requested accommodation. "Literally, of course, the denial of the [requested accommodation] followed the request made by plaintiff." *Williams* 230 F. Supp. 2d at 639. "This averment proves no more than night follows day or that Tuesday follows Monday." *Id.* And there is no evidence that would allow a reasonable jury to conclude KidsPeace retaliated against Ms. Spratley for repeatedly requesting remote work. The record reflects KidsPeace consistently engaged Ms. Spratley in discussions concerning her continued accommodation requests. And KidsPeace granted certain requests, such as Ms. Spratley's request to return to work on December 1, 2021 after initially requesting a November 15, 2021 date of return. ECF No. 40-1 para ¶72 (citing ECF No. 33-3 at 217).

For these reasons, the Court grants summary judgment in favor of KidsPeace on Ms. Spratley's retaliation claims under the ADA and PHRA.

## IV.    CONCLUSION

Ms. Spratley raises factual issues concerning the essential duties of her position and the reasonableness of KidsPeace's proffered accommodation. Accordingly, summary judgment is not warranted on Ms. Spratley's failure-to-accommodate claims under either the ADA or the PHRA.

But Ms. Spratley has not established a prima facie case of disability discrimination under the ADA and PHRA. Nor has she established prima facie cases of retaliation under the ADA, PHRA, or the FMLA. Thus summary judgment is warranted in favor of KidsPeace concerning these claims.

An appropriate Order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge